UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

DEC 29 2016


CLERK

| | |
|---|---|
| KAREN ARTICHOKER, legal guardian and next friend of D.D., a minor, | **3:15-CV-03021-RAL** |
| Plaintiff, | |
| vs. | **OPINION AND ORDER ON PENDING MOTIONS AND AFFIRMING HEARING EXAMINER DECISION** |
| TODD COUNTY SCHOOL DISTRICT, | |
| Defendant. | |

Plaintiff Karen Artichoker brought this action against Defendant Todd County School District (School District) as an appeal from administrative proceedings before a Special Education Hearing Examiner for the State of South Dakota. Doc. 1. The hearing examiner ruled in favor of Artichoker on both issues considered, but Artichoker nonetheless brought this civil action under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1482 (IDEA) because the hearing examiner did not award compensatory education services. Artichoker filed a Motion for Partial Summary Judgment, Doc. 18, and the School District responded by filing a Cross-Motion for Partial Summary Judgment, Doc. 23. Despite this being an administrative case, Artichoker also filed motions to supplement the record and to determine the sufficiency of Defendant's responses to requests for admissions. Having considered the parties' briefings, filed affidavits and exhibits, and having conducted a hearing on the matter, Doc. 49, this Court denies Plaintiff's Motion for Partial Summary Judgment, denies Defendant's Cross-Motion for Partial Summary Judgment, and affirms the rulings of the hearing examiner. This Courts grants

1

supplementation of the record and has considered that material to the extent appropriate, but denies the remaining discovery motions.

## I.    Background

### A. IDEA

This case arises under the IDEA.  The IDEA aims to help meet the educational needs of children with disabilities by ensuring "that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).  A key component in ensuring all students receive FAPE is the Individual Education Program (IEP), which is developed in conjunction with the disabled student's parents, teachers, and local education agencies to ensure the student is receiving all necessary accommodations to meet the child's educational needs. See id. § 1414(d).  Throughout the IDEA and the IEP process, Congress established a specific set of procedural requirements, which the Supreme Court has characterized as requiring the same amount of strict adherence as the substantive features of the IDEA.  See Bd. of Educ. v. Rowley, 458 U.S. 176, 205–206 (1982).  Before an IEP can be developed or any special education and related services can be provided to a student, an initial evaluation must occur "to determine whether a child is a child with a disability," and "to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(C)(i).  The child's parent, a local or state educational agency, or any other state agency can request this "full and individual initial evaluation."  Id. § 1414(a)(1)(A)–(B).  The IDEA makes clear that "[t]he screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services." Id. § 1414(a)(1)(E).

2

The IDEA includes protections for students with a disability who have been "suspended or expelled from school," noting that they also are entitled to FAPE. Id. § 1412(a)(1)(A). As part of this requirement, while a student with a disability may be suspended from school for violating a student code of conduct, if the suspension is to last for longer than ten school days, the student must be placed in an "interim alternative educational setting," so long as the behavior has been deemed not to be a manifestation of the child's disability. Id. § 1415(k)(1)(B)–(C). These procedural protections apply to students if the "local educational agency had knowledge . . . that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred," even though the full and individual initial evaluation under § 1414(a)(1) had not been completed. Id. § 1415(k)(5)(A). A school district is deemed to have knowledge under this section if "the parent of the child has requested an evaluation of the child." Id. § 1415(k)(5)(B). Knowledge also can be attributed to the local education agency if the parent has expressed concern in writing that the child may need special education services, or if the teachers or personnel of the local education agency have expressed specific concerns directly to a special education director or supervisor. Id. However, if a parent has not allowed an initial evaluation, or has refused services, the school district is deemed not to have knowledge of the child's disability, and thus these procedural protections do not apply. Id. § 1415(k)(5)(C).

The IDEA allows any party to present a complaint regarding the identification, evaluation, or placement of a child, or a child's FAPE. Id. § 1415(b)(6). The IDEA requires an "impartial due process hearing" on such a complaint. Id. § 1415(f)(1)(A). This hearing can be provided by either the local education agency or the state; if it is provided by the local education agency, it can be appealed to the state. Id. § 1415(g). Finally, either "party aggrieved" by the hearing results can bring a civil action in a federal district court. Id. § 1415(i)(2)(A); see also

3

Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 67–68 (2005) (Breyer, J., dissenting) (offering an overview of the due process hearing provisions of the IDEA). The district court has the ability to "grant such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Eighth Circuit has recognized that this relief can include compensatory education, but not general or punitive damages. See Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000); Hoekstra v. Indep. Sch. Dist. No. 283, 103 F.3d 624, 625–26 (8th Cir. 1996); Miener v. Missouri, 800 F.2d 749, 754 (8th Cir. 1986).

### B. Facts

Under Local Rule 56.1, Plaintiff Artichoker filed a Statement of Undisputed Material Facts in support of her motion for partial summary judgment. Doc. 19. In response, the Defendant School District filed a response to the Plaintiff's statements, and its own Statement of Undisputed Material Facts in support of its Motion for Summary Judgment. Doc. 26. Plaintiff filed a response to the Defendant's statement of undisputed material facts. Doc. 32. This Court takes the facts in the light most favorable to the Defendant in ruling on Plaintiff's motion for summary judgment, and must take the facts in the light most favorable to Plaintiff in ruling on Defendant's motion for summary judgment. See Scott v. Harris, 550 U.S. 372, 378–79 (2007). In reality, the parties' disputes relate more to how the facts apply in this appeal of a hearing examiner's ruling than to genuine disputes of material fact. Moreover, the standard of review of the hearing examiner's decision is different than the Rule 56 standard. See generally Rowley, 458 U.S. at 204–08.

At the beginning of the 2014–2015 school year at issue in this case, D.D. was a 12-year-old student, enrolled in seventh grade at Lakeview School on the Rosebud Sioux Indian

Reservation, within the Todd County School District. Doc. 19 at ¶ 8; Doc. 26 at 3, ¶ 9.[1] In 2012, Karen Artichoker became the legal guardian of D.D. Doc. 19 at ¶¶ 5–7; Doc. 26 at 3, ¶¶ 5–8. During D.D.'s prior enrollment at Lakeview Elementary, she had minimal behavioral and discipline concerns. Doc. 26 at 7–8, ¶¶ 2–3; Doc. 32 at ¶¶ 2–3.

During the first month of D.D.'s seventh-grade year, the School District reported a number of behavioral incidents. Doc. 26 at 8, ¶ 3; Doc. 32 at ¶ 3. On September 22 or 23, 2014, Artichoker and Bobbi Cox, the Principle of Lakeview School, had a conversation to discuss D.D.'s behavior.[2] Doc. 19 at ¶¶ 11–13; Doc. 26 at 3–4, ¶¶ 12–13; Doc. 26 at 8, ¶ 3; Doc. 32 at ¶ 3. During this conversation, Artichoker verbally requested an evaluation for D.D. to determine if she was eligible for special education services under the IDEA. Doc. 19 at ¶ 13; Doc. 26 at 4, ¶ 14.

In response, on October 1, 2014, the School District held a teacher assistance team (TAT) meeting, which Principal Cox described as the first step in the special education evaluation process. Doc. 19 at ¶ 13; Doc. 26 at 4, ¶¶ 13–14. Artichoker claims that at the TAT meeting, Dr. Gail Mason, a psychologist, advised the meeting's participants that D.D. was suffering from post-traumatic stress disorder (PTSD), and offered an explanation of the disorder; the School District claims that while Dr. Mason was present at the TAT meeting regarding D.D., she was described as a "friend" of Artichoker, and spoke generally about PTSD rather than about D.D. having a PTSD diagnosis. Doc. 19 at ¶¶ 13–14; Doc. 26 at 4, ¶¶ 14–15; Doc. 26 at 9, ¶ 7; Doc.

---

[1] Because the School District has chosen to submit a response to Plaintiff's Statement of Undisputed Facts and its own Statement of Undisputed Facts in the same document using repeating paragraph numbers, this opinion cites both the relevant page and paragraph numbers within Doc. 26.

[2] The parties disagree about who initiated the conversation, and whether it was the first such conversation regarding D.D.'s behavior. Doc. 19 at ¶¶ 11–13; Doc. 26 at 3–4, ¶¶ 12–13; Doc. 26 at 8, ¶ 3; Doc. 32 at ¶ 3. This dispute of facts is not material to the outcome of this case.

32 at ¶ 7. The TAT team developed a written plan to assist D.D. with her errant behaviors, which included advising D.D. of the behaviors that are inappropriate for the classroom environment through a behavioral plan, and a combination of removing D.D. from the classroom when she became disruptive and allowing D.D. to receive more frequent breaks from classroom activities. Doc. 26, at 9, ¶¶ 7–8; Doc. 23-14.

About a week later, Artichoker placed D.D. in the Avera Behavioral Health Adolescent Program at Avera McKennan Hospital, where she stayed for ten days.[3] Doc. 19 at ¶ 16; Doc. 26 at 4, ¶ 17; Doc. 26, at 10 ¶¶ 14–15. Without returning to school, D.D. then went to the Wellspring Residential Treatment Facility on October 17, 2014 to begin a forty-five day course of residential chemical dependency treatment. See Doc. 19 at ¶ 16; Doc. 26 at 4, ¶ 17; Doc. 26 at 10, ¶ 15; Doc. 32 at ¶ 15. Upon completion of the program, D.D. was scheduled to return to school on December 2, 2014, but called in sick, attended school for two days, then called in sick again on December 5, 2014, and did not show up for school the next week, December 8–12, 2014. Doc. 26 at 10, ¶ 17; Doc. 32 at ¶ 17; Doc. 23-8. The School District's winter break began the following Monday, and due to a winter storm, lasted a week longer than usual. See Doc. 26 at 10, ¶ 17; Doc. 32 at ¶ 17.

D.D. had two weeks of attendance in the School District until January 29, 2015, when she was suspended for five days for "assaulting a student and making threats toward a student via social media while at school." Doc. 19 at ¶¶ 20–21; Doc. 26 at 4–5, ¶¶ 19–21. D.D. returned to school on February 5, 2015, but upon bringing a dangerous weapon (a knife) to school on February 6, 2015, was suspended on the following Monday for the remainder of the semester. Doc. 19 at ¶¶ 21–22; Doc. 26 at 5, ¶¶ 20–21. D.D. had posted a photograph of herself to social

---

[3] During part of this time, D.D. was suspended from school for theft of school property. See Doc. 23-9 at 4–5.

6

media holding a four-inch long knife, emblazoned with a marijuana leaf, while at school.  See Doc. 23-13.  D.D. did not receive any form of educational services for the remainder of her seventh grade year during her suspension.  Doc. 19 at ¶¶ 23–24; Doc. 26 at 5–6, ¶¶ 22–23; Doc. 26 at 11, ¶ 23; Doc. 32 at ¶ 23.  The parties contest whether the School District made to Artichoker an informal oral offer of out-of-district educational services for D.D. during her suspension.  Doc. 19 at ¶¶ 23–24; Doc. 26 at 5–6, ¶¶ 22–23; Doc. 26 at 11, ¶ 23; Doc. 32 at ¶ 23.

On April 27, 2015, Artichoker initially filed an IDEA complaint against the School District, and requested a due process hearing.  Doc. 23-2.  Artichoker claimed that the School District had "violated D.D.'s rights under IDEA and deprived her of a free appropriate public education (FAPE), by failing to conduct a full, individual special education evaluation, as required by Section 1414 of IDEA, and by failing to provide D.D. with FAPE or any IDEA procedural rights during the three and one-half months of her expulsion."  Doc. 19 at ¶ 25; Doc. 26 at 6, ¶ 24.  As part of the complaint, Artichoker requested a full and individual evaluation as allowed under the IDEA, an IEP, compensatory education, "including one on one tutoring beginning in the summer, one on one counseling," and attorney's fees.  Doc. 23-2 at 5.  The School District responded, and a due process hearing was scheduled before an administrative hearing examiner for July 7, 2015.  Doc. 19 at ¶ 27; Doc. 26 at 6, ¶ 26.  Before the hearing, the School District made a settlement offer to Artichoker, including providing D.D. with an evaluation while she resided at a short-term facility, at the District's expense; providing D.D. with a tutoring software system she could use over the summer; and placing D.D. in the fall at another school within the district that could better handle D.D.'s needs.  See Doc. 23-20. Artichoker rejected the offer, in party due to the absence of compensatory educational services. See Docs. 23-23–23-24.

The hearing examiner conducted an evidentiary hearing and issued a written decision on August 27, 2015 containing findings of fact, conclusions of law, and a final decision. Doc. 19 at ¶ 29; Doc. 19-3; Doc. 26 at 6, ¶ 28. The hearing examiner considered two issues, both of which were decided in Artichoker's favor: 1) "Whether the Todd County School District's failure to order an evaluation after referral and request for evaluations by the guardian violated the IDEA and deprived D.D. of FAPE;" and 2) "Whether the Todd County School District's expulsion of D.D. without the procedural safeguards of the IDEA deprive her of FAPE." Doc. 19-3 at 1. The hearing examiner ordered that the School District complete a full individualized evaluation of D.D., and that if D.D. was determined to qualify for special services of the IDEA, the School District was required to implement those services within one month, including the convening of an IEP team. Doc. 19-3 at 11.

In November 2015, D.D. was placed at "Our Home" residential treatment facility in its Parkston Psychiatric Residential Treatment Program.[4] Doc. 19 at ¶ 34; Doc. 19-3; Doc. 26 at ¶ 7, ¶ 33. On January 11, 2016, the School District finally arranged for the completion of the individual evaluation to determine D.D.'s eligibility for special education services. Doc. 19 at ¶ 35; Doc. 19-1 at 1. The evaluation concluded that D.D. was eligible for special education services under the IDEA within the categories of emotional disturbance and specific learning disability. Doc. 19 at ¶ 35; Doc. 19-1 at 14–15. On February 18, 2016, an IEP was created to address D.D.'s special learning needs while she resides at the Our Home treatment facility. Doc. 19 at ¶ 15; Doc. 19-2. Artichoker did not take issue with the IEP, and this case makes no challenge to the IEP itself. On April 11, 2016, the School District received notice from the South

---

[4] D.D. continued to reside at Our Home during at least part of the time this case has been pending.

Dakota Department of Education that it had fulfilled the relief ordered by the hearing examiner. Doc. 23-19.

## II.    Standard of Review

Although the parties have filed motions for summary judgment, the IDEA sets forth a specific standard of review for district courts to follow in a case such as this.  Parties aggrieved by a decision of an administrative hearing examiner may bring a civil action in federal district court to appeal the ruling.  20 U.S.C. § 1415(i)(2)(A).  In these administrative appeals, the court is instructed that it "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  Id. § 1415(i)(2)(C). The party challenging the administrative decision retains the burden of proof.  E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley, 135 F.3d 566, 569 (8th Cir. 1998).  This preponderance of the evidence standard is tempered by the direction from the Supreme Court that "due weight shall be given to the[] [administrative] proceedings."  Rowley, 458 U.S. at 206.  The Supreme Court further instructed that "the provision that a reviewing court base its decision on the preponderance of the evidence is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Id. "Whether a child has received a FAPE is a mixed question of law and fact.  Accordingly, when a district court examines this issue, it is obligated to determine independently the legal significance of the [applicable] facts."  K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 804 (8th Cir. 2011) (alteration in original) (internal citation and quotation removed).

Artichoker's motion to supplement the record and the parties' reference to matter not before the hearing examiner present the issue of when to allow supplementation of the

9

administrative record under 20 U.S.C. § 1415(i)(2)(C)(ii).  Case law discussing this issue tends to draw heavily on a First Circuit Court of Appeals decision, later affirmed by the Supreme Court, where the court explained that "[t]he determination of what is 'additional' evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*."  Town of Burlington v. Dep't of Educ. for Mass., 736 F.2d 773, 791 (1st Cir. 1984), aff'd sub nom Sch. Comm. Town of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359 (1985).  While this standard has been adopted in various ways among the circuits, the Eighth Circuit has taken a more conservative approach to supplementing an IDEA appeal record, explaining that "[r]endering a decision on the record compiled before the administrative agency . . . is the norm" and parties require a "solid justification for supplementing the administrative record."  West Platte R–II Sch. Dist. v. Wilson, 439 F.3d 782, 785 (8th Cir. 2006).  The court in West Platte determined it was not error for the district court to refuse to allow supplementation of the record because of the length of the administrative record, over two thousand pages, "together with the fact that we normally determine these issues based solely on the administrative record," and the evidence to be supplemented related to the post-hearing status of the student.  Id.; see also Yankton Sch. Dist. v. Schramm, 900 F. Supp. 1182, 1186 (D.S.D. 1995) (relying on the administrative record in an IDEA case and limited additional evidence to ensure its review did not become one of a trial de novo); M.M. v. Dist. 0001 Lancaster Cty. Sch., No. 8:10CV449, 2011 WL 2680582, at *2 (D. Neb. July 8, 2011) (refusing to allow supplementation of the administrative record in an IDEA case when the evidence to be included was mostly "cumulative to, or an embellishment of, information presently contained in the record"); McComish v. Underwood Pub. Sch., No. 1:06cv65, 2007 WL 1892086, at *2 (D.N.D. June 29, 2007) (rejecting the supplementation of the

10

record with information relating to a student's progress after the administrative hearing because it was not available to the hearing examiner at the time of the due process hearing).

### III.   Discussion

The School District's Cross-Motion for Partial Summary Judgment challenges the hearing examiner's two final decisions: 1) that the School District violated the IDEA and denied D.D. FAPE when it failed to timely evaluate D.D. for special education services; and 2) that the School District violated the IDEA and denied D.D. FAPE when it suspended D.D. for the remainder of the semester without the procedural safeguards required by the IDEA. Doc. 25 at 8. Although both main issues were decided in favor of D.D., Artichoker's Motion for Partial Summary Judgment appeals the absence of an award of any compensatory education for the time D.D. was suspended. Doc. 18 at 3, 11. Artichoker seeks a "reversal of the hearing officer's decision that failed to award compensatory educational services," Doc. 18 at 3, but the hearing examiner did not foreclose compensatory educational services, other than to observe that it would be inappropriate to order specific services before a determination that D.D. was eligible, see Doc. 19-3 at 9, 11.

The Supreme Court in Rowley offered two guiding questions for courts considering challenges to a child's receipt of FAPE: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 206–07 (footnote omitted). The hearing examiner's decision came before D.D.'s IEP was developed, so this Court is limited to evaluating the first question in resolving both the School District's and Artichoker's challenges.

## A. Delayed IDEA Evaluation

Although the record contains testimony that Artichoker may have requested an evaluation of D.D. under the IDEA previously, both parties agree that on September 22 or 23, 2014, Artichoker told Principal Cox that she wanted an evaluation done of D.D. Doc. 40-18 at 46. The School District's response to this request was to initiate its TAT process. Doc. 40-18 at 46. The School District's TAT process is its implementation of the State of South Dakota's version of the Response to Intervention (RTI) model; there is no functional difference between the two. Doc. 25 at 2–3; Doc. 30 at 6; Doc. 40-18 at 3, 45. The RTI models came out of the 2004 amendments to the IDEA, where Congress indicated that "[i]n determining whether a child has a specific learning disability, a local educational agency may use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures." 20 U.S.C. § 1414(b)(6)(B); see also 34 C.F.R. § 300.307(a) (implementing regulation requiring states to adopt "criteria for determining whether a child has a specific learning disability"). In South Dakota's RTI model, there are three tiers of responses and interventions to a child's classroom difficulties. See Response to Intervention Implementation Guide: The South Dakota Model, S.D. Dep't of Educ., 7–9 (2012). The School District maintains that because D.D. was out of school so often after the initial TAT meeting and because a behavioral plan was created, it was not able to proceed through the TAT process and complete a full initial evaluation of D.D. Doc. 25 at 10. Artichoker responds that the TAT process is not a prerequisite to the School District's requirements to complete an evaluation of D.D. under the IDEA. Doc. 30 at 8.

The School District cherry picks from South Dakota's RTI Implementation Guide to support its argument that the TAT process begins the IDEA evaluation. Doc. 25 at 10 ("S.D. Dept. of Education guidance states that 'the time in which the student is [actually] referred for

12

special education eligibility should occur when it is determined that the student has not made sufficient progress during the high quality instruction and interventions.' Ex EE." (quoting Response to Intervention Implementation Guide: The South Dakota Model, S.D. Dep't of Educ., 45 (2012))). However, this leaves out the first sentence of the quoted paragraph from South Dakota's RTI Implementation Guide: "As a reminder, a referral for special education can be initiated at any time throughout the process of RTI." Doc. 23-30 at 3. Similarly, the School District points to Administrative Rules of South Dakota (ARSD) 24:05:25:13.01, which requires "School districts that elect to use a response to intervention model as part of the evaluation process for specific learning disabilities shall submit to the state for approval a formal proposal that at a minimum addresses the provisions in § 24:05:25:12," as evidence that its TAT process began the IDEA evaluation. However, ARSD 24:05:25:12 requires that the district submit to the state a formal proposal that addresses, at minimum, "[t]he documentation that the child's parents were notified about [including] . . . (iii) The parent's right to request an evaluation." ARSD 24:05:25:13.01; ARSD 24:05:25:12(7). Read in conjunction, these two sections envision a scenario where a school district may use an RTI process to help with the child's IDEA evaluation, but make clear that a parent always has the right to step out of the RTI process and obtain a "full and individual initial evaluation" as required by the IDEA. See 20 U.S.C. § 1414(a)(1).

The School District's argument that its TAT process began an IDEA evaluation for D.D. runs contrary to a January 21, 2011 memorandum, sent from the Federal Education Department's Office of Special Education Programs to the Director of Special Education in each state. See Doc. 38-4; Memorandum from Melody Musgrove, Director, Office of Special Education Programs, to State Directors of Special Education (Jan. 21, 2011). This memorandum expressly

addresses the question of timing in the RTI process as it relates to a student's individualized evaluation under the IDEA. Doc. 38-4 at 1. Specifically, the Director of the Office of Special Education Programs stated that "[s]tates and LEAs [local educational agencies] have an obligation to ensure that evaluations of children suspected of having a disability are not delayed or denied because of implementation of an RTI strategy." Doc. 38-4 at 1.

While case law on how the RTI process might impact individual evaluations is relatively sparse, El Paso Independent School District v. Richard R., 567 F. Supp. 2d 918 (W.D. Tex. 2008) is instructive. In Richard R., the school district made the same argument as the School District here: that after a parent requested special education testing, it did not ignore the parent's request, but scheduled a TAT meeting. Id. at 946. Richard R.'s parents requested an individualized evaluation under the IDEA in August 2005, but instead of initiating the evaluation, the school district began an RTI process in October 2005, delaying the full referral for special education testing until September 2006, thirteen months after the initial request. Id. at 946–52. After a due process administrative hearing, the district court upheld the finding of the state hearing examiner that "the IDEA gives the parent a right to seek an evaluation and overrides local district policy concerning intervening procedures," and where a TAT "committee impedes the exercise of rights guaranteed by federal law, those practices violate the IDEA." Id. at 946 (internal quotation removed).

The hearing examiner in D.D.'s case specifically reasoned that "a school district cannot require that a student complete an RtI process before it conducts an evaluation for special education eligibility. Regardless of the RtI process the IDEA regulations grant parents the right to request an evaluation for special education services at any time." Doc. 19-3 at 7 (emphasis removed). The hearing examiner based this conclusion on the January 2011 memorandum and

14

Eighth Circuit precedent regarding FAPE requirements. Doc. 19-3 at 6–7. The hearing examiner specifically focused on South Dakota's Administrative Rules requiring the full and individual evaluation to occur within 25 school days after a signed parental consent to evaluate, and made a conclusion of law that the School District did not comply with this requirement. Doc. 19-3 at 10; ARSD § 24:05:25:03. Under the circumstances of this case, the more appropriate timeliness question is the length of time between the initial request for evaluation and the beginning of the evaluation process, because the School District never provided Artichoker with a formal request to consent to the evaluation of D.D. Artichoker requested a special education evaluation of D.D. no later than September 22 or 23, 2014. Doc. 19 at ¶ 13; Doc. 26 at 4, ¶ 14. The School District did not offer D.D. the required testing until June 2015, as part of the settlement agreement discussions before the due process hearing. Doc. 23-20. A delay of nine months has been deemed to be unreasonable by many courts that have considered the question in the context of a local educational agency's "child find" responsibilities.[5]  See N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1205–06, 1209–10 (9th Cir. 2008) (delay from August to March unreasonable); Richard R., 567 F. Supp. 2d at 946 (delay of thirteen months unreasonable); New Paltz Ctr. Sch. Dist. v. St. Pierre ex rel. M.S., 307 F. Supp. 2d 394, 401 (N.D.N.Y. 2004) (delay of ten months unreasonable); W.B. v. Matula, 67 F.3d 484, 501 (3rd Cir. 1995) (delay of six months was a triable issue), abrogated on other grounds, A.W. v. Jersey City Public Sch., 486 F.3d 791 (3rd Cir. 2007); Dep't of Educ. of Hawaii v. Cari Rae S., 158 F. Supp. 2d 1190, 1195–97 (D. Haw. 2001) (delay of six months unreasonable). The School District did not complete the testing until after the hearing examiner required it to do so.

---

[5] The "child find" provisions of the IDEA require that local educational agencies receiving funds implementing the IDEA seek out children who may have a disability and ensure they are "identified, located, and evaluated" to ensure they are receiving a proper education and applicable special needs services. See 20 U.S.C. § 1412(a)(3).

A full review of the administrative rules and guidance from the state of South Dakota, along with the relevant case law, establish that while the RTI process can occur before, or in conjunction with, an initial evaluation under the IDEA, if a parent makes a request for an initial evaluation of her child for special education services, the RTI process cannot be used to delay, in any way, that evaluation. The hearing examiner's decision that the School District violated the IDEA by failing to provide a full and individualized evaluation is affirmed.

The School District also argues that it was unable to timely complete an evaluation of D.D. because of the actions of Artichoker and D.D. Doc. 25 at 6. The School District points to three main ways in which Artichoker was responsible for a delay in D.D.'s requested evaluation: 1) Artichoker never provided any written diagnosis to the School District; 2) Artichoker refused to sign a medical release for the School District regarding D.D.; and 3) Artichoker unilaterally removed D.D. from the School District for several large periods of time. Doc. 25 at 8–11. First, while the School District may be correct that having a written diagnosis of an ailment that D.D. was suffering from would have sped up the evaluation process, the School District could have started the evaluation, beginning with sending a parental consent form for Artichoker to sign, without any written diagnosis for D.D. Second, there are no materials in the record supporting the School District's argument that Artichoker "deliberately withheld any diagnosis information from the District." Doc. 25 at 11. In fact, testimony at the initial hearing suggests that no conscious decision was made to withhold medical information from the School District. See Doc. 40-18 at 17. Finally, removing D.D. from the School District and the number of days of school missed (both scheduled time off, and absences) undoubtedly did, as the hearing examiner reflected, make it more difficult for the School District to complete D.D.'s evaluation. Doc. 25 at 10; Doc. 19-3 at 9. However, the ability of the School District to perform the evaluation after

16

it was ordered by the hearing examiner, while D.D. was attending a school outside of the district, indicates that the School District could have had D.D. evaluated during her absences and well before the hearing. See Doc. 19-1.

## B. Suspension without IDEA Protections

The District next argues that the hearing examiner erred when she found that D.D. had been denied FAPE when the suspension without IDEA safeguards occurred. The IDEA includes procedural protections for students with a disability who are sanctioned for violating a code of student conduct. 20 U.S.C. § 1415(k). If a student with a disability violates a code of student conduct, it is determined that the violation is not a manifestation of the child's disability, and the punishment is removal of more than ten days from the current educational placement, then the child must receive FAPE from the school district in an alternative educational setting. Id. § 1415(k)(1)(C)–(E). D.D. was suspended for more than ten days without receiving FAPE from the School District in an alternate setting. The IDEA provides procedural protections for children even if they—as was the case with D.D. at the time—have "not been determined to be eligible for special education and related services . . . if the local educational agency had knowledge . . . that the child was a child with a disability[.]" Id. § 1415(k)(5)(A). Knowledge under this specific section, as relevant here, occurs when a parent requests a full and individual evaluation for special education services under § 1414(a)(1)(B). Id. § 1415(k)(5)(B). However, a school district is excused from this knowledge if "the parent of the child has not allowed an evaluation of the child . . . or has refused services[.]" Id. § 1415(k)(5)(C).

The School District first argues that it had no actual knowledge of D.D.'s disability because it was never provided a written diagnosis of D.D.'s disability before the suspension. Doc. 25 at 11. It argues that although Dr. Mason discussed PTSD at D.D.'s TAT meeting, it had

17

no knowledge that D.D. suffered from PTSD. Doc. 25 at 11. As the School District's counsel acknowledged at the motion hearing, the TAT meeting was convened only for D.D., and no other student was discussed at the meeting. Doc. 49. Thus, when Dr. Mason, who knew and treated D.D., discussed PTSD during a TAT focused solely on D.D., the School District could surmise that D.D. might have PTSD. Regardless, actual knowledge of a disability is not required under § 1415(k)(5)(B); the section is satisfied so long as an evaluation of the child has been requested. The School District admits that Artichoker requested an evaluation of D.D. on September 22 or 23, 2014, well before D.D.'s suspension from school. Doc. 19 at ¶ 13; Doc. 26 at 4, ¶ 14.

The School District next argues that it qualifies for the exception in § 1415(k)(5)(C); that because it offered to pay for an out-of-district placement for D.D. and Artichoker refused, it cannot be deemed to have knowledge of D.D.'s disability prior to her suspension. See Doc. 25 at 13; Doc. 40-18 at 52, 54; 20 U.S.C. § 1415(k)(5)(C). The School District asserts that it offered to place D.D. at an out-of-district school during her long term suspension, more than once, but that Artichoker refused those services. See Doc. 34 at 12–13. Any such offer occurred verbally and apparently casually over the telephone during a conversation between Artichoker and Principal Cox. See Doc. 40-18 at 52, 54. Artichoker's declination of one, or possibly two, informal and vague verbal offers of out-of-district placements was because Artichoker hoped to keep D.D. living at home. Doc. 40-18 at 63–64. This Court is unpersuaded that this equates to a full rejection of all special education services offered to D.D. that would excuse the District from § 1415(k)(5). See M.G. v. Crisfield, 547 F. Supp. 2d 399, 403–05, 414–15 (D.N.J. 2008) (parental refusal under § 1415(k)(5)(C) involved repeated refusals of both classification under the IDEA and placement at a specific school on a specified date). At the very least, the School District should have confirmed any offer in writing to Artichoker, explaining the offer and the

next, or alternative, steps in the process. This Court must give the hearing examiner's finding of facts "due weight" on this issue, see Rowley, 458 U.S. at 206, and must make a decision based on the "preponderance of the evidence," see 20 U.S.C. § 1415(i)(2)(C)(iii).

The hearing examiner's discussion of this second issue, D.D.'s FAPE during her suspension, was brief. Rather than including a separate reasoning section for this issue, the examiner "specifically adopt[ed] the reasoning set forth in pages 5 through 8 of the Petitioners brief dated August 18, 2015." Doc. 19-3 at 9; Doc. 40-15 at 5–8. Although the hearing examiner ideally should have supplied her own reasoning separately, the cited reasoning from the Petitioner's brief parallels what this Court discussed above. The Petitioner's brief also raises 20 U.S.C. § 1415(k)(5)(C) and 34 C.F.R. § 300.301(a), which require that any offer of special education services can occur only after a full individual evaluation has been completed on a child. See 40-15 at 7. Indeed, because a full evaluation was never completed on D.D., even had the School District made a formal offer of an out-of-district placement for D.D., it would not have satisfied the provision of services under 34 C.F.R. § 300.301(a), and was not replacement for a full individual evaluation and IEP.

Having considered the evidence available to the hearing examiner at the time of her decision, the decision is upheld and the School District's Cross-Motion for Partial Summary Judgment, Doc. 23, is denied. D.D. should have been receiving the protections of the IDEA during her suspension. Despite this Court's ruling below on the issue of compensatory educational services, this is not a situation where the School District's actions resulted in only a procedural defect of the IDEA, as the School District argues. See Doc. 25 at 15. Unlike in Costello v. Mitchell Public School District 79, 266 F.3d 916, 922 (8th Cir. 2001), where a failure to follow the IDEA to the letter did not result in a loss of educational opportunity to the student,

19

here D.D. went three and a half months without any access to educational services because of a failure of the School District to begin a timely evaluation of D.D.

### C.     Compensatory Education Award

Finding that the hearing examiner was correct in determining that D.D. was denied FAPE, "if it [was] necessary" during her suspension brings this Court to the core issue raised by Artichoker: whether the hearing examiner erred in failing to award any compensatory education. Doc. 19-3 at 10. Although Artichoker raised the issue in briefing and at the hearing, the hearing examiner only discussed compensatory education in her decision by name in a short evidentiary ruling allowing testimony regarding compensatory education, and "giv[ing] it the weight she deems appropriate." Doc. 19-3 at 2; <u>see</u> Doc. 40-13 at 15–16; Doc. 40-18 at 15. When the hearing examiner released her decision, no assessment of D.D. had been done, and in turn no determination of a disability or IEP requirement existed, so the silence of the decision as to compensatory education services is not peculiar. Thus, the hearing examiner noted that "the school never completed the requested evaluation. The school has not finished the evaluation process since September of 2014 so there can be no FAPE being provided, *if it is necessary.*" Doc. 19-3 at 10 (emphasis added). From this Court's research, compensatory education claims appear in federal courts in situations where a student's disability has been established before the filing of a due process complaint with a state hearing examiner. <u>See generally</u> <u>Forest Grove Sch.</u> <u>Dist. v. T.A.,</u> 557 U.S. 230, 242 (2009) (although not such a case itself, describing as "common" the "situation in which a school district has provided a child with some special-education services and the child's parents believe those services are inadequate"); <u>Doe ex rel Doe v. Todd</u> <u>Cty. Sch. Dist.,</u> 625 F.3d 459 (8th Cir. 2010); <u>M.M. ex rel. L.R. v. Special Sch. Dist. No. 1,</u> 512 F.3d 455 (8th Cir. 2008); <u>Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett,</u> 440 F.3d 1007 (8th

20

Cir. 2006); <u>Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.</u>, 280 F.3d 831 (8th Cir. 2002); <u>Indep.</u>

<u>Sch. Dist. No. 284 v. A.C.</u>, 258 F.3d 769 (8th Cir. 2001); <u>Strawn v. Mo. State Bd. of Educ.</u>, 210

F.3d 954 (8th Cir. 2000). In this case, Artichoker as the prevailing party is appealing a lack of

compensatory education award in a situation where the hearing examiner's decision ordered the

School District to evaluate D.D., and for D.D. to receive an IEP if needed.

Not surprisingly, then, because all the evidence arguably justifying compensatory

education services was not available or in existence at the time of the hearing, Artichoker has

sought to engage in discovery and supplement the record, with two pending motions to

supplement the record, Docs. 38, 41, and two motions to compel discovery, Docs. 42, 44. In

addition to the reasons listed below, because Artichoker's motions to compel discovery have no

bearing on the outcome of this case, they are both denied. This Court has read each of the

complained-of questions and answers in Artichoker's Motion to Determine Sufficiency of

Defendant's Answers to Request for Admissions, Doc. 42, and has determined that the School

District was entitled to use the explanatory responses that it did. Artichoker's requests were not

"straightforward" or "unequivocal," Doc. 43, in that they attempted to distill case-dispositive

applications of facts to law into one-sentence requests for admissions; the Motion is denied.[6] <u>See</u>

<u>Disability Rights Council v. Wash. Metro. Area</u>, 234 F.R.D. 1, 3 (D.D.C. 2006).

This Court previously allowed Artichoker to supplement the record, but noted the nature

of this administrative appeal and "reserve[d] judgment on what weight and value to give the

---

[6] Artichoker also filed a Motion for Order Directing Counsel for the Defendant to Sign the
District's Responses to Plaintiff's Request for Admissions, Doc. 44, and supporting
memorandum, Doc. 45. The School District's Responses to Plaintiff's Second Request for
Admissions was signed by the Superintendent of the School District with the School District's
counsel signing only a certificate of service and not a certification under Rule 26(g)(1)(B) of the
Federal Rules of Civil Procedure. Although such a certification should have been made, the
issue is moot in light of this Court's rulings.

additional evidence." Doc. 27 at 1. This Court will allow supplementation of the record again, but is mindful of its scope of review of supplemented evidence. Although a district court may consider additional evidence as provided by parties in its review, and this Court has done so, it must be careful not to let the review devolve into a trial de novo. See Town of Burlington, 736 F.2d at 791; West Platte, 439 F.3d at 785; Yankton Sch. Dist., 900 F. Supp. at 1186.

The Eighth Circuit's IDEA jurisprudence takes a restrictive approach regarding supplementation of the record, which indicates to this Court that it should weigh more heavily the information known by the hearing examiner at the time of the hearing. See West Platte, 439 F.3d at 785; Yankton Sch. Dist., 900 F. Supp. at 1186; see also McComish, 2007 WL 1892086, at *2. At that time, D.D. had yet to be evaluated for special education services. In order to award compensatory education, the hearing examiner would have had to assume both that D.D. would ultimately be found to qualify for special education services, and that D.D.'s IEP would not include adequate compensatory education to resolve the three and a half month denial of FAPE experienced by D.D. during her suspension. See Doc. 19-3 at 9 ("Based on the above, it is inappropriate for this examiner, before knowing if services are mandated, to order Ms. Artichoker's requests for only Rapid City intervention."). The hearing examiner theoretically could have awarded general or specific compensatory education in the form of hours of tutoring, but this would have risked doubling any special accommodation and structure that might be included in D.D.'s IEP.

This Court feels it inappropriate to vacate or reverse in part the hearing examiner's decision and then fashion an award of compensatory education to D.D. Judicial review under the IDEA is necessarily limited, because federal judges are not trained educators, nor are they regularly charged with creating educational policy. See Rowley, 458 U.S. at 206; Blackmon v.

22

Springfield R–XII Sch. Dist., 198 F.3d 648, 655 (8th Cir. 1999).  Nearly two years have passed since D.D.'s suspension, and during that time she has progressed two grade levels.  See Doc. 19-2 (D D.'s February 18, 2016 IEP listing D.D. as being in 8th grade); Doc. 49 at 2:23pm–2:25pm (D.D.'s counsel affirming that D.D. is now in 9th grade).  In these circumstances, it is inappropriate for this Court to overturn the decision of the hearing examiner, or, even after an evidentiary hearing, to write an order that would essentially be a new IEP providing specific hours and types of compensatory education.  Such an order would require this Court to "substitute [its] own notions of sound educational policy for those of the school authorities," which the Supreme Court has cautioned against.  Rowley, 458 U.S. at 206.  Some courts have remanded decisions on particular compensatory educational services to the hearing examiner for further consideration, but here the hearing examiner made no error in her ruling, and could not be expected to fashion a remedy prior to the evaluation and IEP having been done.  Accord Thomas v. District of Columbia, 407 F. Supp. 2d 102, 115 (D.D.C. 2005) (remanding after finding hearing examiner incorrectly interpreted IDEA statute, but refusing to fashion a compensatory education award itself because the record lacked both evidence that it would benefit the child and evidence that it may not be needed because it would not help or the child "has flourished in his current placement").  Moreover, Artichoker's specific request for compensatory services from the hearing examiner—four months of one-on-one tutoring and daily psychological counseling provided by professionals in Rapid City, outside the School District—likely exceeds what is proper to award.  See Doc. 40-13 at 16; Doc. 19-3 at 9 ("Based on the above, it is inappropriate for this examiner, before knowing if services are mandated, to order Ms. Artichoker's requests for only Rapid City intervention.").  The IDEA has been interpreted time and again to provide and guarantee FAPE for students with disabilities—a floor, baseline level of education, not the

best education possible for a child.  See Rowley, 458 U.S. at 203; A.W. v. Northwest R–1 Sch. Dist., 813 F.2d 158, 163–64 (8th Cir. 1987); Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997); K.E., 647 F.3d 795, 809 (8th Cir. 2011).

The IDEA does not require an award of compensatory educational services every time a child has been denied FAPE.  Cases outside the Eighth Circuit favor awards of compensatory education, as "replacement of educational services the child should have received in the first place." Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005); see also G. ex rel. R.G. v. Fort Bragg Dependent Sch., 343 F.3d 295, 308–09 (4th Cir. 2003); Doc. 18 at 13–14.  Even so, such cases, especially within the Eighth Circuit, require compensatory education only when and in the amount "necessary to secure the child's right to a free appropriate public education," Miener, 800 F.2d at 753, in reflection of the IDEA's instruction that relief should be granted "as the court determines is appropriate," 20 U.S.C § 1415(i)(2)(C)(iii). See Burlington, 471 U.S. at 369 (explaining that a reviewing court has discretion in awarding relief "'appropriate' in light of the purpose of the [IDEA]"); Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000) ("[T]he district court may order compensatory education if it deems such a remedy just and proper . . . ."); Parents of Student W. v. Puyallup Sch. Dist. No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994) ("Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA. . . . It may be a rare case when compensatory education is not appropriate, but it was not an abuse of the district court's discretion to decide that this case was such a rarity.").  D.D. was provided with an evaluation and is currently working under an IEP to address her behavioral and special learning disability issues.  Doc. 19-2.  D.D. was in seventh grade when she was suspended for three and a half months, but has progressed and reportedly was enrolled in ninth

grade classes at the Our Home facility. While D.D., like most children, would benefit from private tutoring and counseling, she is progressing through the educational system with the services provided in her IEP. If she needs private tutoring now as a consequence of what occurred in her seventh grade year, or as part of the IEP, the proper course is to seek to modify the IEP and file a claim if there is disagreement with that IEP.

For the above reasons, this Court determines that Artichoker has not met the required burden of proof that the hearing examiner erred in not providing specific compensatory education to D.D., and denies Artichoker's motion for partial summary judgment on this issue.

## IV.   Conclusion

While this Court is sympathetic to the difficulties that Artichoker has had in attempting to obtain a standard level of education for her child, she has not met her burden of persuading this Court that the hearing examiner erred. Educational policy, and the proper progression of a student's education are decisions best made initially by the educators in daily contact with the student. At the time of the hearing examiner's decision, D.D. had not yet been evaluated, and did not have an IEP; it was impossible for the hearing examiner to know whether D.D. would qualify for compensatory educational services or not have adequate services provided through a future IEP. The School District, similarly, has failed to persuade this Court that the hearing examiner erred in its decision that D.D. experienced an undue delay in receiving an evaluation and a subsequent FAPE denial.

Therefore, it is hereby

ORDERED that Plaintiff's Motion for Leave to Submit Additional Evidence, Doc. 38, is granted and that additional material may be part of any record on appeal. It is further

ORDERED that Plaintiff's Motion to Supplement the Record with Admissions by Defendant, Doc. 41, is granted. It is further

ORDERED that Plaintiff's Motion to Determine the Sufficiency to Defendant's Answers to Request for Admissions, Doc. 42, is denied. It is further

ORDERED that Plaintiff's Motion for Order Directing Counsel for the Defendant to Sign the District's Responses to the Plaintiff's Request for Admissions, Doc. 44, is denied as moot. It is further

ORDERED that Plaintiff's Motion for Partial Summary Judgment, Doc. 18, is denied to the extent that it seeks reversal on the absence of compensatory education services. It is further

ORDERED that Defendant's Cross-Motion for Partial Summary Judgment, Doc. 23, is denied. It is finally

ORDERED that the decision of the hearing examiner is affirmed.

DATED this 29th day of December, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

26